UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CASE NO. 05-10059-DPW

**UNITED STATES**

**VS.**

**CHAD BENJAMIN**

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO SUPPRESS STATEMENTS AND EVIDENCE**

**STATEMENT OF FACT**

On December 16, 2004 members of SCAT (South Coastal Anti-Crime Team)[1] were conducting a "round up" in Taunton, Massachusetts called "Operation Crack Down". This mass arrest was the result of an extensive investigation of alleged drug dealers in and around Taunton, Massachusetts.

According to grand jury testimony of Agent Sheila O'Hara who was reading police reports prepared by participating officers, one of the "target's" name was Jesse Texeira. Detective Mike Grundy was aware that there was a warrant outstanding for Jesse Texeira. Chief Jack O'Neil, Grundy and Detective James Dykus met to coordinate their plan of arrests.

On December 16, 2004 they were not "targeting" Texeira. They "happened" to be driving down the street where Texeira lives when they saw two black males walking down the driveway to the house they believed was occupied by Texeira. they allegedly could not identify the males as they drove by. One had a hooded sweatshirt on. They

---

[1] According to a "memorandum of understanding" signed by chief law enforcement officers of Taunton, Dighton, Somerset, Seekonk, Swansea, Rehoboth and Bristol Sheriff's Department, law enforcement

1

observed them enter Egan's Package Store located in the same area as Texeira's residence.

The police parked their car in the parking lot and entered the store. Wearing police raid jackets with badges exposed they entered the store and demanded that both individuals produce identification. One of the men, Jesse Miranda, produced identification. The defendant, Chad Benjamin, told the police that he did not have any identification on his person. Upon further questioning, he stated that he must have left it in his car. He was further interrogated as to where his car was located. He indicated that it was outside.

It was at this point that the police allegedly saw the defendant make movements "towards the pouch pocket" of his rather large sweatshirt.[2] Detective Grundy shouted, "let me see your hands," grabbed at the sweatshirt and felt what appeared to be a gun. He then yelled "gun" and threw the defendant to the ground where he was accosted by the other officers and was eventually handcuffed and arrested.[3] Once the defendant was handcuffed on the ground a Smith & Wesson pistil, loaded with six rounds of .380 ammunition was retrieved. The police also found a package of suspected crack cocaine weighing approximately 15 grams. They did not know whether it came from Miranda, the defendant or someone else. According to testimony of Sheila O'Hara at grand jury it was a "very small store."

The warrant issued for Jesse Texeira (annexed as B) indicates a description of a 6' male, 170 lbs. with long bushy hair. The defendant, as indicated b Exhibit C, is 5'11",

---

created a "multi-jurisdictional task force to engage in, among other things, "covert and overt investigations concerning individuals engaged in illicit criminal activities." Exhibit A.

[2] The movements were innocuous at best, not furtive, consisting of a patting motion, very common for one looking for a wallet.

2

190 lbs. with a shaved head.[4]  In any event, it is clear that although Detective Grundy initially reported that he was going to the Texeira home to <u>execute an arrest warrant</u> (police report annexed as D).  During the discovery phase of the case he has revised his report (E) to confirm that he was, in fact, *not* on the team seeking to execute the Texeira warrant.  It is quite clear that the execution of the Texeira warrant was not the motivating force behind the police accosting the two men who were merely seen walking near a residence and into a public place.

William Higginbothom noted in his statement to Federal Agent Sheila O'Hara that the defendant and another man come into the store.  Shortly after they entered, police approached them and demanded identification.  One man produced identification.  The defendant "said something about he left it in the car."  When police asked where was the car, he stated that the car was "not here" at which point the police "frisked" the defendant and found the gun immediately.  Both men were brought to the ground and handcuffed.  He heard the police claim they found "packets" but he didn't see any.  The incident happened "so fast."

**A.    APPLICABLE SEARCH AND SEIZURE LAW**

As this Court is well aware, the Fourth Amendment to the United States Constitution provides that;

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated and no warrants shall issue but upon probable cause supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

---

[3] Miranda was also thrown to the ground and handcuffed at the same time.
[4] William Higginbothom noted that the defendant came into his store every day.  He would sing and rap. He described him as a "light skinned stocky black male about 5'10".  Edson Miranda was shorter and darker as well as much "quieter."

3

U.S. Constitution, Amendment IV. The basis purpose of the Fourth Amendment is to safeguard against the privacy and security of individuals against arbitrary invasions by governmental officials. Michigan vs. Tyler, 436 U.S. 499, 504; 98 S.Ct. 1942, 1947 (1978). The reach of this Amendment extends beyond the paradigmatic entry into a dwelling by a law enforcement officer in search of fruits or instrumentalities of crime. Id. The Fourth Amendment;

> Protects two types of expectations, one involving "searches," the other, "seizures." A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A "seizure" of property occurs where there is some meaningful interference with an individual's possessory interests in that property. United States vs. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1660 (1984).

If evidence is seized illegally by the police the exclusionary rule will generally apply and any evidence obtained as a result of such search will be barred from admission at a defendant's trial. The Supreme Court has held that even evidence *indirectly* obtained through an illegal search or an illegal arrest may be excludable "as fruit of the poisonous tree." Wong Sun vs. United States, 371 U.S. 471, 484-87, 83 S.Ct. 407, 415-17, 9 L.Ed.2d 441 (1963). The Court stated;

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has come at by exploitation of that primary illegality or instead by means sufficiently distinguishable to be purged of primary taint." Id. at 487-88, 83 S.Ct. at 417-18.

Under the doctrine of Terry vs. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884-85, 20 L.Ed.2d 889 (1968) police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause. See also Whren vs. United States, 517 U.S. 806, 116 S.Ct. 1769 (1996). Such suspicion must be supported

by some minimal level of objective justification. United States vs. Sokolow, 409 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). To withstand scrutiny, an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch.'" Id. (quoting Terry, 392 U.S. at 27) (internal quotations omitted). The officer may not rely on mere suspicion or a hunch to justify the stop. See Terry, 392 U.S. at 27. Terry held that "a police officer may *in appropriate circumstances* and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Id. at 22 (emphasis added); United States vs. Maguire, 359 F.3d 71, 76 (1st Cir. 2004). In evaluating the validity of a *Terry* stop, we consider the totality of the circumstances. Maguire, 359 F.3d at 76. See also United States vs. Lott, 870 F.2d 778, 783 (1st Cir. 1989) ("In reviewing the reasonableness of a *Terry* stop, a court must consider all of the relevant circumstances where are not to be dissected and viewed singly; rather they must be considered as a whole.") (quoting United States vs. Gilliard, 847 F.2d. 21, 24 (1st Cir. 1988).

In evaluating whether there was reasonable suspicion, it must first be determined whether the officer's actions were justified at their inception and, if so, whether the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop. Maguire, 359 F.3d at 76 (quoting United States vs. Trueber, 238 F.3d 79, 92 (1st Cir. 2001). The first part of the inquiry is satisfied if the officers can point to specific and articulable facts which, if taken together with rational inferences derived from those facts, reasonably show that an investigatory stop was warranted. Maguire, 359 F.3d at 76 (citing Sokolow, 490 U.S. at 7 and United States vs.

5

Kimball, 25 F.3d 1, 6 (1st Cir. 1994). The second inquiry is whether the scope of the investigatory stop was reasonable under the circumstances. Maguire, 359 F.3d at 77 (citing Trueber, 238 F.3d at 92).

**B.    THERE WAS NO REASONABLE SUSPICION TO BELIEVE CRIMINAL ACTIVITY WAS AFOOT.**

The defendant submits that there was no reasonable suspicion to support an investigatory stop and seizure of the defendant. In this case, the police spotted the defendant leaving what they believed to be a residence of Jesse Texeira who lived at that address alleged to be a "known drug distribution location" and nothing more. They followed the defendant into an adjacent package store and almost immediately conducted a stop and frisk inside the package store without reasonable suspicion to support that investigatory stop and seizure. The officers failed to satisfy even the first inquiry under Maguire because their actions were not justified at their inception. Here, the officers followed the defendant into the package store and immediately conducted a *Terry* stop. The only basis for their suspicion of the defendant was that he was walking with another black man and appeared to be leaving what they believed to be a known drug house.[5]

The defendant was stopped inside the package store and the police demanded identification which he explained that he did not have. Immediately, they conducted a pat-down search of the defendant, against his will, and the officer felt what he thought was a gun. The defendant was then immediately tackled, thrown down and arrested. The defendant was not wanted for any crime nor was he observed committing any crime. Nor was the defendant observed engaging in any suspicious activity prior to the investigatory

---

[5] It is clear that any pretextual attempt to justify this conduct fails when the lack of the warrant or any similarity in appearance between the defendant and Texeira are noted.

6

stop and seizure.  He was merely walking with a friend.

Articulable suspicion turns on all the circumstances surrounding the actions of the suspected wrongdoer.  Maguire, 359 F.3d at 76; United States vs. Knox, 839 F.2d 285, 290 (5th Cir. 1988), cert. denied, 490 U.S. 1019 (1989); United States vs. Armijo, 781 F.Supp. 1551 (D.N.M. 1991) (holding that the officer did not have reasonable suspicion sufficient to support a *Terry* stop simply because the defendant was a young Hispanic who had been traveling first class on a train); United States vs. White, 890 F.2d 1413 (8th Cir. 1989) (drug agents lacked reasonable, articulable suspicion to justify detention of the defendant or his luggage after defendant deplaned from a drug source city even though the defendant arrived early in the morning, purchased one-way ticket with cash, held carry-on bag closely with both hands, appeared nervous as he walked through the airport and as he talked with drug agents and even though the flight on which the defendant had arrived yielded arrests of narcotics traffickers.).  See also United States vs. Wood, 981 f2 536 (DC Cir. 1992) (police officer without articular suspicion, standing behind the defendant ordered him to stop and "halt right there" whereupon he stopped and a gun fell out constituted an illegal seizure.

In United States vs. Fifty-Three Thousand Eighty-Two Dollars in United States Currency, 985 F.2d 245 (6th Cir. 1992), the Sixth Circuit Court of Appeals held that the seizure of currency was not justified by reasonable, articulable facts.  On June 6, 1988, DEA Agents approached baggage claimants based upon the following observations; one claimant was shaking his head nervously, claimants were waiting in a departure area of a plane headed for Dallas, a known city for narcotics, claimants carried only small gym bags for luggage and claimants isolated themselves from others.  Id.  After Agents

identified themselves, claimants produced airplane tickets that were purchased with cash that were for a flight to Dallas and a return flight to Detroit the next day.  Id. Additionally, when Agents discovered money, claimants made evasive statements regarding the origin of the money.  Id.

"Drug profile characteristics can provide some objective basis for the government's suspicions, however, courts have hesitate to rely too much on the drug courier profile because it lists behavior which can be attributed to perfectly legal activities as well as illicit ones."  Id. at 249.  The court found that the statements made by the claimants, coupled with their drug courier profile provided only "inchoate and unparticularized suspicion…[not] specific reasonable inferences which [can be drawn] from the facts…"  Id. (citing Terry, 392 U.S. at 27).

The defendant in the current case was merely leaving a residence with a friend.  It was the residence itself that the officers suspected was involved in criminal activity.  The officers had no reason to believe that the defendant or his companion were involved in illegal activity.  Nonetheless, the inchoate and unparticularized suspicions of the officers involved in this *Terry* stop were based entirely on the fact that the defendant was seen leaving the residence in question.  Therefore, the *Terry* stop in this case does not satisfy the first inquiry under Maguire because the officers' actions were not justified in their inception.  The *Terry* stop against the defendant in this case was instigated by the officers' observations of his completely legal and seemingly innocent behavior of leaving a residence and walking into a package store.  The *Terry* stop of the defendant quickly developed into a formal arrest as the officers immediately conducted a pat-down search of the defendant, felt what they believed to be a firearm and physically restrained the

8

defendant and handcuffed him.

In <u>United States vs. Romain</u>, 393 F3 63 (CA 1, 2004), cert. den. 125 S.Ct. 2924 (U.S. 2005) the First Circuit held that inquiry into the validity of a Terry stop must survey the totality of the circumstances.  The Court must inquire into the validity of the police conduct and whether it was justified at the inception of the confrontation and whether the police conduct was legitimately based upon their response to the emergency circumstances.

The ready display of weaponry and aggressive police conduct may be considered by the Court in its determination of the reasonableness of the intrusion and its degree.  A valid concern for police safety may justify police aggression as in <u>United States vs. Vargas</u>, 369 F3 98 (CA 2 2004) where police had to chase the fleeing defendant with knowledge from an informant of reliability that he was carrying a weapon.  The evaluation of the reasonableness of the police conduct is fact-specific and requires analysis of the circumstances known to the police at the time of the confrontation.  See <u>United States vs. Foster</u>, 376 F3 577 (2002 FED. App. 0230P (6th Cir. 2004), cert. den. 125 S.Ct. 635 (U.S. 2004) (police handcuffed a defendant during a confrontation where the defendant clearly smelled of PCP.  The defendant wanted to sit in his car because he was cold.  The officer did not want a man on PCP near weapons that may have been in the car.  <u>United States vs. Lindsay</u>, 114 Fed. App. V 718 (2004) (6th Cir. 2004) (police were justified in putting the defendant to the ground with guns drawn when investigating a crime of violence, the stop was brief with no other indicia of arrest).

A warrantless search violates the Fourth Amendment unless it falls within one of the few carefully limited exceptions to that important constitutional protection.

Minnesota vs. Dickerson, 508 U.S. 366 (1993), United States vs. Woodrum, 202 F3 1 (1st Cir. 2000). One of these exceptions is the "Terry" stop where a police officer with reasonable suspicion of criminal activity may detain a suspect briefly for questioning aimed at confirming or dispelling his articulable suspicions. Dickerson, supra, United States vs. Campa,   F3 (2000). The officer must possess "specific and articulable facts which taken together with rational inferences from those facts reasonably warrant that intrusion." Terry at 21, Woodrum at 6.

In addition to a stop for questioning Terry permits a pat down search for weapons if there is a reasonably objective belief that the suspicious individual is armed and presently dangerous. Dickerson, 508 U.S. at 373. Such a pat search is strictly limited to a pat for weapons to insure officer safety. Adams vs. Williams, 407 U.S. 143 (1972). The pat must be limited to an "exterior pat of the clothing for objects which might be used as instruments of assault. Sibron vs. New York, 392 U.S. 40 (1968). When such a frisk goes beyond what is necessary to determine if the suspect is armed the fruits will be suppressed. United States vs. Schiavo, 29 F3 6 (1st Cir. 1994).

The conduct of the police must be reasonably related in scope and degree to the circumstances which initiated the confrontation. United States vs. Nee,   F3   (2001), United States vs. Sharpe, 470 U.S. 675 (1985), United States vs. Stanley, 915 F2 54 (1st Cir. 1990).

In the recent First Circuit case of United States vs. Smith, 2005, U.S. App. at Lexis 19489, September 9, 2005, the First Circuit Court of Appeals discussed the circumstances surrounding the delineation between a Terry encounter and an arrest. In the Smith case, Boston Police officers approached the defendant in the afternoon on a

10

routine cruiser patrol.  Smith was sitting on a 2-3 foot wall behind the sidewalk on a street in Boston.  The officers noted that they were familiar with the "locals" and neither recognized Smith.  They returned to where Smith was sitting after circling the block and a police officer leaned out the window and asked him if he lived in the house behind him.  The defendant indicated he did not.  Further questioning occurred when he was asked what he was doing sitting on the wall.  He noted he was waiting for a bus.

The officers got out of the patrol car to fill out a field report and approached the defendant and asked him for identification or his name.  It was at this point that Smith advised that he had an outstanding warrant for a motor vehicle violation which was confirmed by the police.  He was then placed under arrest and resisted by violently dragging the officers down the sidewalk and punching the police.  During a search subsequent to his arrest a loaded pistol with a round in the chamber and three in the magazine were found in his waistband.

The First Circuit noted that "law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."  Citing United States vs. Drayton, 536 U.S. 194 (2002).  On the other hand, the Court noted that a seizure may certainly occur without actual physical restraint.  "If an officer, by means of a show of authority even briefly restrains the liberty of a citizen, we may conclude the seizure has occurred."  Citing Terry vs. Ohio, 392 U.S. at 19.  The Court further noted that in finding a seizure the Court should conclude that coercion, not voluntary compliance most accurately describes the encounter.

The defendant submits that the circumstances of the present case clearly fit the

11

definition of "coercion." This was a confrontation by armed SWAT Team cloaked officers that certainly did not constitute "otherwise inoffensive contact between a member of the public and the police." United States vs. Mendenhall, 446 U.S. 544 at 555.

The Smith Court noted that most citizens may feel some degree of compulsion when confronted by law officers asking questions and such discomfort cannot be a measure of Fourth Amendment seizures. The Court noted, however, that it is clear that when a "citizen's freedom of movement is objectively restrained…there (is) any foundation for invoking constitutional safeguards." The Smith Court contrasted the circumstances in Mendenhall which were conducive to a determination through judicial fact finding of permissible questioning rather than impermissible restraint. These factors which closely correspond to the instant case are that the events took place in the public concourse, the agents wore no uniforms and displayed no weapons, they did not summons the respondent to their presence but instead approached her and identified themselves and requested but did not demand to see respondent's identification and ticket. In the Benjamin case, the police were not only wearing uniforms and displaying weapons but were outfitted in bullet proof vests with demarcations of their SWAT-like team. They were aggressive in their approach to the defendant and his friend and they demanded identification.

The Court in Mendenhall as cited in Smith went on to cite examples of circumstances that might indicate a seizure as;

"1.) Threatening presence of several officers.

2.) Display of a weapon by an officer.

    3.)      Some physical touching of the person, and;

    4.)      Use of language or tone of voice indicating that compliance with the officer's request might be compelled."

It is apparent and clear that the Benjamin factors clearly fit this set of circumstances which indicate a seizure has occurred in the constitutional sense. As always, the Court must consider the totality of the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter. <u>United States vs. Bostick</u>, 501 U.S. 429 (1991).

Unlike the factors presented in the <u>Smith</u> case, in this case, Mr. Benjamin was unable to terminate the encounter and declined to produce his identification. Unlike the factors presented in <u>Smith</u>, it is clear that "nothing further would have happened to him" had he declined to produce his identification because the factors certainly speak to the subsequent contact between the police and the defendant resulting in his forcibly being thrown onto the floor.

As Justice Lynch stated in the dissent to the <u>Smith</u> opinion,

> "The test is necessarily imprecise because it is designed to access the coercive effect of police conduct, taken as a whole, rather than the focus on particular details of that conduct and isolation. Moreover, what constitutes (a seizure) will vary not only with the particular police conduct at issue but also with the setting in which the conduct occurs." <u>United States vs. Chesternut</u>, 486 U.S. at 573. See also <u>United States vs. Cardoza</u>, 129 F3 6 (1st Cir. 1997) ("the test employed in this area is highly fact specific"). In making the seizure determination, the pertinent facts are mirrored."

Further, Justice Lynch noted that <u>United States vs. Bostick</u>, 501 U.S. 429 and <u>United States vs. Brown</u>, 169 F3 89 (1st Cir. 1999) which were relied on by

13

the government were inapposite. She noted that Bostick which employs the totality of the circumstances test supported the District Court's conclusion that Smith was free neither to terminate the encounter nor to walk away from the police. In Bostick, she noted that the defendant was a passenger on a bus scheduled to depart for a destination he wanted to reach and thus could not leave before the police encounter.

In the Smith case she noted that the defendant, before the officers blocked him in, was perfectly free to leave. Justice Lynch felt that the government was wrong. Physical limitations did not create the seizure; "the police did."

As is argued in the instant case, the trial court is uniquely situated in a position to evaluate the credibility of the testimony, especially when the totality of the circumstances must be examined based upon testimony, credibility and inferences made by the Court. Justice Lynch's dissent was based on her opinion that the officers' actions were entirely consistent with a seizure based on reasonable suspicion which explains their failure to approach Smith in a way that communicated that he was free to leave.

The instant case presents a similar situation to those present in United States vs. Nee, supra where the Court held that the police conduct was in excess of the reasonable limit justified by a Terry stop.[6] The Nee Court noted that a limited search for weapons could be constitutionally permissible if a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. Terry at 27. The Nee Court noted how important it is for the fact finder to "hear the testimony,

---

[6] The trial court specifically "ceased to credit" the officer's story. Nee-fn2 at the point they noted concern to justify a pat frisk.

14

observe the witness' demeanor and evaluate the facts first hand." Citing <u>United States vs. Zapata</u>, 18 F3 971 (1st Cir. 1994).

The defendant submits that even if the police had a basis to approach the defendant and the other man it was clear that there was no reason to believe that he was Texeira and certainly no reason after the extended interrogation regarding his automobile and identification to throw him down and pat for weapons. In the instant case police were not involved in serving a warrant on Texeira although they may have been aware of its existence. The dissimilarity in appearance clearly belies any good faith belief that Benjamin may have been the sought after Texeira. The armed officers wearing their neck badges and flack jackets had no reasonable basis to believe that the defendant and his friend were involved in any criminal or suspicious activity. Further, there was no basis for continued questioning of the defendant coupled with the swift and almost instantaneous take down of both men which subsequently revealed the weapon and ammunition.

A Terry stop requires an articulable suspicion meaning a rational reason rather than a hunch. Whether there is reasonable suspicion for a Terry encounter is a strictly objective inquiry. Hence, in <u>Bolton vs. Taylor</u>, 367 F3 5 (1st Cir. 2004) the Court held that the police articulated a reasonable suspicion of prostitution where they saw a known prostitute leave the defendant's car in her "territory," smile at the officers and the rather nervous looking defendant drove away at a high rate of speed.

The officer's actions must be justified at its inception and reasonably related in scope to the circumstance which justified the interference in the first place. <u>Hiibel vs. Sixth Judicial District Court of Nevada, Humboldt County</u>, 524 U.S. 177, 124 s.Ct. 2451,

15

159 L.Ed. 2 292 (2004). Accord <u>United States vs. Jacobsen</u>, 391 F3 904 (8th Cir. 2004), <u>United States vs. Soto</u>, 375 F3 1219 (10th Cir. 2004), <u>United States vs. Johnson</u>, 383 F3 925 (D.C. Cir. 2005) (no reasonable suspicion articulated where the police had a dispatch describing a firearm sale in a known drug area in the early morning hours with a description of two nearby vehicles. The officer shortly thereafter spotted the vehicle almost matching the description of one of the vehicles within six blocks of the illegal activity.

A request for identification may be a reasonable interaction with a citizen so long as it is related to the purpose of the initial interaction. <u>Hiibel vs. Sixth Judicial District Court of Nevada, Humboldt County,</u> supra (note that Nevada had a statute that required identification to be produced under its "stop and identify" law.

**C.    CONCLUSION**

The officers that conducted the *Terry* stop and frisk of the defendant lacked any reasonable suspicion or articulable facts that would justify the investigatory stop. Under the totality of the circumstances, the investigatory stop and frisk of the defendant was not warranted and was illegal. The defendant was not wanted for any crime and was not observed committing a crime or otherwise doing anything to arouse the suspicions of the officers. He was merely walking out of a house that the officers suspected was involved with illegal narcotics. Obviously, if the officers had sufficient evidence that the house was involved in illegal drug trafficking they would have obtained a search warrant against the residence and terminated the illegal drug trafficking from that residence. Clearly, the officers did not have sufficient evidence to connect drug trafficking with the residence enabling them to act against the residence in some fashion. How then can the

defendant's leaving of the same house create reasonable suspicion of criminal activity and articulable facts justifying a *Terry* stop?  The answer is, of course, that the defendant's completely innocent act of walking away from a residence did not provide reasonable suspicion or articulable facts justifying his search and seizure inside the package store.  Therefore, all evidence and statements procured as a result of the illegal arrest of the defendant inside the package store must be suppressed.

        Chad Benjamin,
        By his attorney

        /s/ Kevin J. Reddington, Esq.