# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

**Criminal Number**
**No. 05-10059-DPW**

## UNITED STATES OF AMERICA

## VS.

## CHAD BENJAMIN

## DEFENDANT'S SUPPLEMENT TO MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS

This Court allowed the parties extended hearing to develop the facts surrounding the confrontation between Chad Benjamin and the police leading to his ultimate arrest.  Hearings took place on two occasions resulting in three volumes of transcripts.

A review of the transcripts is set forth below.

**<u>Michael Grundy</u>** testified that he was a detective sergeant with the Taunton Police Department (I-2)[1] and had been so employed for twelve (12) years.  He was a supervisor on the "vice unit" on the date of the incident in question on December 14, 2004 (TR1-3).

At that time Taunton was a participant in a law enforcement group known as SCAT (South Coast Anti-Crime Team).  The document

---

[1] There are three volumes of transcripts.  December 8, 2005-morning session, Vol. I, December 8, 2005-afternoon session-Vol. II and January 12, 2006-Vol. III.

constituting the memorandum of understanding was introduced at Exhibit 1 (TR1-4).  SCAT was a multi-jurisdictional task force in cooperation with the Bristol County Sheriff's Department.  On that day SCAT was conducting a "round up" of suspects who were to be charged as a result of a 3-4 month investigation where undercover police officers made narcotic purchases (TR 1-5).

On December 16th there were a number of officers in Taunton to execute arrest warrants.  Grundy was "overseeing the whole operation" (TR1-6) called "Operation Crack Down."  Earlier that day 20-30 officers staged at the Taunton Police Station.  They break out into two large teams with 6-8 officers in each team.

The police had numerous warrants to execute.  One of the arrestees was a man named Jesse Santos Texeira.  The officer had seen him "at a distance on surveillance" as well as viewing photographs.[2]  Team 2 led by Officer Ed Pearson was tasked with the arrest of Texeira.  The police had information that Texeira would possibly be at the Taunton High School for basketball practice (TR1-9).

Mr. Texeira, according to a booking sheet, was 17 years old.  He was 72" with a weight of 170 lbs.  He was described by the witness as a "dark

---

[2] Defendant Chad Benjamin had no warrant outstanding on that date.

male" (TR1-10-).  He had "long, flowing hair."  (Exhibit 2-booking sheet).
The officers received a package of information on all of the targets including
a copy of the warrant and photographs depicting him as a "dark make with
long hair" (TR1-12).

 The operation began around noontime.  The officer left the station and
the two teams headed out to effectuate the arrests.  People were taken into
custody.  He and three other officers got into his vehicle and drove to the old
Taunton mall on Cohannet Street where they met up with another detective.
He then drove down Cohannet Street in the company of Chief Jack O'Neil[3]
from SCAT, Detective Dykas from Taunton and Detective Ryan from
Swansea.

 At approximately 3:30 p.m. (TR1-67) while he drove his unmarked
cruiser down Cohannet Street with a packet of warrants[4].  He had the
intention to "drive through the city" and check another location.  While
driving he made an observation of two men walking down a driveway at 66
Cohannet Street, the residence of Jesse Texeira.  In fact, the officers believed
that Texeira was at the high school for basketball practice.  They had no
intention to stop at his house, knock on the door or find out if anyone was
home (TR1-84).  He did not recall where he was going in the city.  He noted

---

[3] "Chief" O'Neil was employed by the Bristol Sheriff's Office.

that the men were two black males walking down a driveway.  They were in traffic and he had to "pull a U-turn."  Once he turned the vehicle he saw the men walking into Egan's Package Store which was two doors down from the house.  (Photographs of the area depicting the store were introduced as 9A and 9B).

They did not observe any furtiveness in the movements of the men. He saw their backs (TR1-20, TR1-82).  The police were attired in "raid jackets" with badges on chains."[5]  They were armed.  His intent when he turned the vehicle around was to approach the men for an investigation (TR1-20).  All of the officers exited the car and entered the liquor store.  It was crowded.  (Photograph of the store admitted as Exhibit 9E).

When the police entered the store they saw the two men standing at the counter.  He did not recall if they were making a purchase (TR1-22).  He testified Ryan was the first one in followed by Dykas, himself and O'Neil. The area they found themselves in was 8/10' (Exhibit 9AA).  He described it as "pretty cramped."

The men were asked for identification by both Grundy and Dykas. They were two-three feet away from the men when they demanded

---

[4] In his police report the witness stated that he was "executing a warrant on Mr. Texeira."  At the hearing, he admitted that this was not correct (TR1-16).
[5] The officer stated that "it was pretty apparent we were police officers."

identification.  Benjamin "make a gesture."  The other man with Benjamin

was Edson Miranda described at 5'8", 145 lbs. (Exhibit 7, TR1-26).[6]

Benjamin was attired in a dark colored hooded sweatshirt.  While

standing at the counter, in response to the demand for identification,

Benjamin stated that he did not have his I.D. and stated that it was in the car.

When asked where the car was he indicated that it was "outside" (TR1-27).

The officer said that he "appeared to be very nervous" and started "putting

his hands on his sweatshirt-like patting the front of his sweatshirt (TR1-28).

The officer agreed that he did not make any reference at all to this alleged

observation of "nervousness" notwithstanding it apparent importance (TR1-

28).

The witness claims that it was while he was patting his sweatshirt that

he observed "what appeared to be a bulge" down near the sweatshirt (TR1-

29).  The officer was impeached by his report where he noted that the

defendant "placed his hand over the front part of the sweatshirt" as opposed

to "patting with," as demonstrated, cupped hands on the front of the

sweatshirt (TR1-30).

The defendant was told to "put his hands up" while he was patted

down at which point the officer felt a hard object and his "finger went into

---

[6] Even though Miranda did not even remotely resemble in height, weight or appearance Texeira, he was asked for identification as was Benjamin (TR1-26).

the trigger part of the handgun."  This was from the outside (TR1-30).  He yelled, "gun" and brought the defendant to the floor.[7]  While on the ground the weapon was removed from his pocket (.380 automatic) described as metal.  At no time in his interaction with Benjamin did Grundy observe him act with hostility or take flight.[8]  He testified that it was when he;

Q:     Saw Benjamin "acting nervous and touching his front pocket on his sweatshirt that (you) asked him to raise his hands?"

A:     Correct.

Q:     After he---did he raise his hands?

A:     Yes, he did.

Q:     After he raised his hands, what did you do?

A:     I went immediately to the sweatshirt and felt the outside of the sweatshirt.

Q:     When did you do after that?

A:     As I felt it my hand went right in the trigger guard.

Q:     On the outside of the pocket?

A:     Correct.  (TR1-75-76).

---

[7] At the same time Miranda was brought to the ground although the officer could not recall the other individual.
[8] Small bags of what appeared to be cocaine were on the ground between the bodies of the two supine suspects.

At the time of the interaction Grundy noted that there were other civilians in the store. One was Mr. William Higginbotham who was known to Grundy. He was a store clerk. A female clerk named Carol was next to Higginbotham. Both were behind the counter (TR1-57).

Grundy again explained why he prepared a supplemental report pertaining to the misstatement in the initial report regarding his "execution" of the Texeira warrant. (Police reports admitted (Exhibit 2) TR1-64 and (Exhibit 3) TR1-64).

Benjamin's booking photograph depicting him in a hooded sweatshirt was admitted as Exhibit 5 (TR1-69). Further, it was noted that Benjamin, according to booking information, was 5'11" and 190 lbs. with a medium build. He was noted as having a "light brown complexion." He was 26 years old (TR1-91-Exhibit 5).

**Carol Busczek** testified that she was employed as a cashier at Egan's Package Store on December 16, 2004. She had been so employed for a year and a half (TR1-91). At the time of Benjamin's arrest she was out front at the register. Others in the store were William Higginbotham, store manager and her boss, Dan Walsh (TR1-93).

She saw the defendant who was known to her at a customer walk into the store. He went to a cooler and got a juice or a soda. He was with

another male.  As they made their way to the counter with juice, candy or chips the officers came in.  They asked the defendant if he had an I.D. to which he responded that he did not have an I.D. on him (TR1-94).  He was then asked where it was and he stated in (my) car.  The officer then said, "let's go get it."  The defendant said my vehicle is not here.  It was at this point during the interchange that they "approached him and kind of threw him on the counter."  "They searched him-like frisked him."  Then they yelled "he had a gun" and they "threw him on the ground" (TR1-95).  Both men were arrested.  At no time in the interaction between the defendant and the police did she observe any furtive or suspicious movements nor was he loud or strident.

Ms. Busczek noted on direct examination that there is a video camera located on the premises (TR1-97).  See also TR1-123-124.  She testified that the store practice is if the store is open the video is on (TR1-98).  She noted that the video of December 16, 2004 was "taped over."  She further testified that "Billy" Walsh told her not to mention the video as "he'd prefer not to get involved."[9]

On cross-examination Ms. Busczek testified that she stopped working in January of 2005.  She denied that she was fired by Mr. Walsh for stealing

---

[9] Mr. Walsh admitted to the witness that the tape was destroyed or taped over (TR1-99).

(TR1-101).  She explained her falling out and why she left.  She was never questioned by any police officers.  She recalled working in front with Billy Higginbotham when the men came in the store.  They were talking.  During the incident she yelled for Mr. Walsh (TR1-102).  She recalled that Benjamin was wearing a "sweat suit."  She was not sure but felt he may have been wearing a sweatshirt (TR1-102-103).

The witness demonstrated the movement and location within the confined space of the defendants and the police (TR1-112, 113).  She demonstrated where on the counter and floor the defendant was placed (TR1-117).  She testified that the employees would refer to the videotapes on occasion.  She re-wound tapes maybe five or six times in the year and a half she was employed (TR1-126).  She did not see the videotape of this incident (TR1-127).

The Court questioned the witness regarding the appearance of the sweatshirt.  She did not recall a hood on the head (TR1-130).  She knew Jesse Texeira and stated that he came in the store "all the time."  She noted in response to the Court's question that Texeira is "a lot taller and thinner" with "braided hair."[10]

---

[10] The defendant had close-cropped hair similar in appearance to his appearance in Court.

**James Dykas** is a police officer in Taunton, Massachusetts and has been so employed for twenty-nine years. He worked on a regular basis with Detective Grundy although he was assigned to the Major Crimes Unit (TR1-133).

On December 16, 2004 he was part of the staging pre-execution of warrant conference at the Taunton Police Station (TR1-133). He was not aware that Jesse Texeira had an outstanding warrant (TR1-133). He was a passenger in Grundy's vehicle. He was present during the operation as the evidence officer. They were driving around for about an hour and a half in an unmarked vehicle. He was in the back seat (TR1-136). While driving around[11] "we saw two individuals walking out of a driveway" (TR1-138). They had no intention of executing a warrant or looking for any individual in the house next to the driveway where they saw two men walking. He heard Grundy say, "this is the house where one of the targets lives" (TR1-139). He said, "there's two guys coming out of the driveway now." The witness did not see any men as he was "stuffed" in the back seat (TR1-139). The car took a U-turn and parked to the left of the liquor store. At that point he (Grundy) said "he wanted to see if that was the subject that lived at that

---

[11] He recalls that they were not looking for a specific individual while driving around (TR1-138).

house on Cohannet Street." He did not know the name of the subject nor did he look at any photographs (TR1-141).

They "all" got out of the car to go into the liquor store. He did not see any people go in the liquor store. As he entered the store with his raid jacket clearly noting "Police" as well as badges on neck chains[12]. They all entered the liquor store.

Upon entry he saw two individuals at the counter as well as two clerks. They might have been another customer in the store as well (TR1-143). Officer Ryan entered the store first followed by this witness. Grundy and O'Neil followed in that order. Ryan and Grundy approached the two men. He stood in the background "securing the area" to insure that no one could escape or get by him (TR1-144).

He had a heightened sense of awareness of his personal safety. He saw Grundy approach the defendant and say "do you have any I.D. on you?" (TR1-145)[13] He did not recall Benjamin saying anything to the officer. He heard no conversation about any motor vehicle nor did he recall Grundy turning the defendant around or order him around (TR1-147). He heard "gun!" within seconds and saw Grundy "throw the subject to the ground"

---

[12] He was carrying a weapon which was "exposed" (TR1-157) in a holster.
[13] He did not recall the tone of voice or content of the inquiry (TR1-146).

(TR1-147).  It was at this point that Dykas jumped on the defendant who was on the ground.

On cross-examination he stated that he recognized Busczek as well as Higginbotham (TR1-149).  He had a memory that when the incident occurred Mr. Walsh came out from the back room of the store (TR1-150). He believed that when they entered the store Busczek left the register.  He did not recall if she came back (TR1-151).

**Dykas** believed that Benjamin had a hooded sweatshirt on with the hood up (TR1-153).  He could not recall that he had anything in his hands at that time (TR1-154).  Benjamin was facing Grundy.  Dykas further testified on cross-examination that the four armed police officers entered.  On redirect examination Dykas agreed that he is a frequent shopper at Egan's. Mr. Walsh is a person who knows a lot of police officers (TR1-171).

Upon questioning by the Court, the witness noted that he has investigated criminal matters at Egan's (TR1-172).  He has reviewed videotapes maintained by the store in the past (TR1-173).  On re-cross he noted that he did not view the surveillance tapes on December 16, 2004 (TR1-173).

**Sergeant Gregory Ryan** testified that he is employed as a sergeant on the Swansea Police Department.  He has been so employed by seventeen

years (TR2-180). In December of 2004 he was a member of the SCAT team. He served as a support member (TR2-182). During the day he "jumped" in the car operated by Detective Grundy. He was "along for the ride" (TR2-188). He described the itinerary of locations they intended to visit (TR2-186).

He testified that they were going after Jesse Texeira and were going to the high school. The sergeant said, "let me check on an address" and during the conversation Ryan stated that he (Texeira) was a football player. At this point Grundy stated "that's his house right there" as we were passing it (TR2-186). Grundy then stated, "wait a minute, maybe that was him right there." Ryan did not see anyone walking. He noted that they turned around in a U-turn fashion and all entered the liquor store. He was first, Dykas was second (TR2-191). The store was very small and cluttered. Two men were at the counter. They turned and looked towards Ryan (TR1-192).

He approached the men with his "raid jacket with a badge" and said, "hi guys, how are you doing? I'm a police officer"…and I just said you guys have any I.D. on you? (TR2-192). Mr. Miranda handed Ryan an I.D. The other man stood there was no apparent reaction (TR2-193). He did not see anything in their hands. He recalled that there may have been a soda on the counter (TR2-193). Benjamin was wearing a sweatshirt with the hood

up. The sweatshirt was dark. It had a "big hood" (TR2-194). He noted a

clerk behind the register although he did not recall the sex of the person

(TR2-198). He recalled;

> "As I walked in I was surprised at how small the place
> was and I became fixated on them, you know, movements and
> so forth. Approached them directly and maintained all my
> focus safety-wise and so forth" (TR2-99).[14]

His attention was focused on Miranda. It was at that point that

Grundy "addressed" Benjamin (TR2-202). He heard Grundy ask him about

an I.D. (TR2-202)[15]. At this point he saw that the Miranda I.D. was not

"Texeira" but he nevertheless decided to "run this guy for warrants" (TR2-

203). When he was leaving the store he heard "gun" and drew his weapon.

He turned around and saw Benjamin on the ground. He recalled the

defendant's sweatshirt as being "large" (TR2-226).

**John O'Neil** is employed by the Bristol County Sheriff's office. He

was a Somerset Police officer for thirty (30) years (TR2-228). He, too, was

a SCAT participant who was in the Grundy vehicle in his capacity as an

officer "overseeing the entire operation" (TR2-230).

---

[14] He noted that he was from a small town. He just completed a "raid" which was something he didn't "regularly do." His sense of safety was "up there" at a "heightened level" (TR2-199). He stated that he "took a high stance position" (TR2-201).

[15] Ryan did not her any conversation between Benjamin and Grundy pertaining to the defendant's motor vehicle (TR2-219).

This witness recalled that they were driving to the police station.  He observed Grundy looking in his rear view mirror and commented about the two males exiting the driveway.  He looked but did not see anything (TR2-235) when Grundy pulled the vehicle around.  They stopped in front of Egan's and entered en masse (TR2-235).  He was the last to enter.

When he entered the store Benjamin and Miranda were turned toward the entry team.  He recalled Benjamin to be wearing a dark colored hooded sweatshirt that "wasn't tight." (TR2-238).  He heard Grundy ask for identification.  Benjamin said that it was "out in the car."  Grundy asked, "where was the car" at which point he saw Benjamin's two arms "go down towards his waist."  He observed Grundy's hand reach out towards his groin and forcibly grab something.  He yelled, "gun."  At this point he grabbed Benjamin and threw him to the ground.

On cross examination the witness noted that in his capacity as head of the SCAT unit he did, in fact, see the photographs of those individuals named in the warrants (TR2-249).  During the conversation between Grundy and Benjamin the witness did not observe any bulge (TR2-258).  He further testified;

Q:     At the time you made the observations of him putting his hands down like you displayed for us on the witness stand or down towards the groin area of either side of his hips, you don't notice any bulge do you, sir?

A.     I never described him reaching his hands going to either side of his hips, sir.  Could I testify to what I testified to?

Q:     Sir-when you saw his hands go down, sir, you didn't notice a bulge in his sweatshirt, did you?

A:     What I said, sir was I saw his arms---

Q:     Did you notice a bulge or didn't you?

THE COURT:     Just a moment.  All right.  The question is, did you observe a bulge at that time?

THE WITNESS;   I—

THE COURT:     Yes, yes or no?

THE WITNESS:   No.  (TR2-259)

The Court ordered the gun produced for inspection the next date (TR2-261).

**William Higginbotham** testified that he was a clerk working at Egan's Package Store at the time the defendant was arrested (TR3-5).  He saw Mr. Benjamin come in his store around mid-afternoon.  He was working that day with Carol Busczek.  Mr. Walsh, the owner, was down in the cellar.

She was with him (TR3-5).  When Mr. Benjamin came in, he was behind the counter.  Ms. Busczek was beside him.  Very shortly after the police[16] came in the store.  He believed there were either "three to four or seven of them" (TR3-7).  He did not recall their first words.  He did hear them ask them for I.D.  He heard Benjamin say to Grundy that his I.D. was "in the car."  He wanted Chad to get the I.D. out of the car and he told him the car wasn't outside.  At that point the officer told him to turn around when he then patted him down.  It was at that point that he heard "gun" and the officer "placed him on the ground" (TR3-9-10).

The witness recalled that after the incident he and Mr. Walsh "took a look at the tape" (TR3-11).  The tape was a live video that captures movements in real time (TR3-11).  The tape was taped over the next day because "no one came in asked for (the) tape for a few days so we didn't think we had to have it (TR3-12).

On cross-examination the witness recalled that Busczek was fired as she was "caught stealing" (TR3-180).  He did not recall what Benjamin was wearing that day.

**Daniel Walsh,** the owner of the store for 17 years testified.  He recalled that Carol Buszcek worked for him for at least a year and he fired

---

[16] He knew Det. Grundy personally for thirty (30) years.  He is "friends" with him.

her (TR3-32). The day of the incident he was down in the basement when he heard Ms. Busczek call for him. He heard a thump (TR3-34). He came upstairs and saw police officers that he knew. He saw uniforms (TR3-37). He did not observe the confrontation between the defendant and the police. He reviewed the videotape (TR3-37). You could see the police and Benjamin as well as another individual on the tape (TR3-38). He couldn't see what was going on between Benjamin and the police (TR3-39). The tape re-taped itself as it was on a repeat mode. He denied telling Busczek not to tell the police that the tape was available or that he destroyed the tape (TR3-42).

On cross-examination he agreed that his confrontation with Busczek occurred shortly after this incident. He denied the fact that O'Neil, Ryan or Dykas were regular customers of the store (TR3-45). The only reason he reviewed the tape after the police left was "curiosity" (TR3-41). He looked at the tape "a couple of times." He left it in the machine and "forgot about it" (TR3-46).

At the conclusion of the testimony the Court examined the weapon for size as well as the ammunition (Exhibit 13A).

**Supplemental Argument**

Subsequently to the filing of the defendant's motion to suppress and accompanying memorandum of law the case of United States vs. Omar Sharif McCoy, 428 F3 38 (November 1, 2005) was decided.  In that case, this Court was affirmed in its ruling allowing a motion to suppress.  The facts in Sharif McCoy are similar to the facts in this case at bar.

The evidence presented showed two plain clothes Boston police officers stopped a motor vehicle for a motor vehicle violation.  The officers testified that as they approached the vehicle they made "eye contact" with the operator and saw him leaning and moving his dim towards the console.  Suspecting that he was reaching for a weapon he was asked to get out of the car.  At that point he was pat frisked and contraband was seized.

The Court noted that this Court found that although the initial stop was justified, the ensuing pat down was not based on an objective basis for the officer's suspicion that McCoy was dangerous and posed a threat to their safety.  In McCoy, the defendant was in a "high crime area" with two recent incidents of shootings.  The instant case does not present any evidence of a high crime area.  Cf. United States vs. Stanley, 915 F2 54 (1st Cir. 1990), United States vs. Lott, 870 F2 778 (1st Cir. 1989) cited in United States vs. Omar Shariff McCoy, supra.  The "furtive movements" noted by the police

and argued by the government were "easily explained" according to the

Appeals Court;

> "Nervousness is a common and natural reaction to police
> presence and the District court found that McCoy knew he was
> dealing with police officers at least from the time the two
> officers approached his car.  Moreover, there was nothing
> sinister or menacing about McCoy's reaching movement
> towards the center console.  <u>Although it is possible that such a
> movement could be to get a weapon, the movement is also
> consistent with reaching for a driver's license or registration, a
> perfectly lawful action that is to be expected when one is pulled
> over by the police.</u>[17]"

The Court noted that consistent with <u>Terry vs. Ohio</u>, 392 U.S. 1

(1968) a protective frisk for weapons requires a reasonable inference that the

person being searched is armed and dangerous.  <u>McCoy</u> at 41 citing <u>Sibron</u>

<u>vs. New York</u>, 392 U.S. 40 (1968).

In the opinion allowing the motion to suppress, the Court noted that

concern for officer safety is certainly a factor to be considered.  The Court

further noted that;

> "This is not to say that officers are entitled to frisk anyone they
> briefly detain.  To have an adequate foundation for such limited
> searches the officer 'must have constitutionally adequate
> reasonable grounds for doing so.'  Citing <u>Sibrion vs. New York</u>,
> 392 U.S. 40 (1968).  (The officer) must be able to point to
> particular facts from which he reasonably inferred that the
> individual was armed and dangerous.  When assessing these
> particular facts, courts are to consider the totality of the
> circumstances (citing <u>United States vs. Gilliard</u>, 847 F2 21 (1st

---

[17] This observation is very applicable to Benjamin's movements patting his clothing when asked for I.D. by
the police.

Cir. 1988), recognizing that roadside encounters between police and suspects are especially hazardous. <u>Mulligan vs. Long</u>, 463 U.S. 1032 (1983).

In the instant case, unlike the <u>McCoy</u> case, the defendant was committing no illegal act nor was he acting at all in a suspicious manner. Cf. <u>Whren vs. Brown</u>, 517 U.S. 806 (1996). Further, while addressing the issue of articulable facts necessary for a valid frisk, the Court delineated boundaries have been subjected to constant pressure in the case law because searches and frisks that do not result in weapons or contraband "do not make it to the courthouse door. Yet the events are real." <u>McCoy</u>, supra. These daily events were recognized as being "events of real, constitutional and cultural significance."

In the present case unlike <u>McCoy</u> there is no evidence of "nervousness" or "high crime locale." As in <u>McCoy</u> the "movements" must be determined in context to determine if it is actually furtive. <u>McCoy</u>, supra at 18. The Court in <u>McCoy</u> distinguished many other circuit cases that are inapposite to the "furtiveness" of movement issue. <u>United States vs. Nash</u>, 876 F2 1359 (7th Cir. 1989), <u>United States vs. Denney</u>, 771 F2 318 (7th Cir. 1985). This Court noted that "<u>Denney</u> teaches that movement alone is not what courts are to consider but rather movement signifying danger within a

particular context."  <u>Memorandum and Order</u>, December 9, 2004,

Fed. Supp.            (2004).

It is submitted that Benjamin's patting of the sweatshirt was consistent

with his being asked for identification.  The testimony of civilian witnesses

Busczek and Higginbotham indicate that it was after he stated that his I.D.

was in the car and the ensuing discussion about the location of the car that

Grundy ordered him to "turn around" at which point he was frisked and the

"gun" was found.

The alleged "bulge" seen by Grundy does not fit with a reasoned

evaluation of the testimony and evidence.  The Court has had an opportunity

to view the size of the weapon.  It is clear that this weapon in the pouch of a

large hooded sweatshirt would not be readily observable.[18]

It is argued by the defendant that once he was ordered to "turn

around" to be pat frisked he was "seized" for purposes of the Fourth

Amendment.  <u>Whren vs. United States</u>, 517 U.S. 806 (1996).  It is therefore

an initial seizure that is unreasonable and violative of the Fourth

Amendment.

---

[18] The "loss" of the tape is most unfortunate in this respect.

The defendant respectfully requests that the motion to suppress be allowed.

Chad Benjamin,
By his attorney

/s/Kevin J. Reddington