```
             UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )   CRIMINAL NO. 05-10059-DPW
       v.                   )
                            )
CHAD BENJAMIN               )
```

MEMORANDUM AND ORDER
May 10, 2007

This case presents the cognitive tension that ensues when a justifiable police encounter develops into an unjustifiable police pat down resulting in the seizure of a concealed weapon. After the discovery of the weapon, any hunch or suspicion that the suspect was armed appears reasonable in retrospect. But the legal touchstone is whether the facts giving rise to the police search before its results are assessed can be said to be sufficient to constitute reasonable suspicion. *Cf. United States v. Wright*, No. 06-1351, slip op. at 12-16 (1st Cir. May 4, 2007) "It is a central tenet of Fourth Amendment jurisprudence that the fruits of a search cannot be used to establish that same search's validity." *Id.* at 13. My extended review of the evidentiary record in this case, including evaluation of the credibility of witnesses who appeared live before me and multiple rereadings of the transcript, compels me to find the pat down of the defendant here was not supported by reasonable suspicion *ex ante* and accordingly the weapon seized must be suppressed *ex post*.

I. FINDINGS OF FACT

-A-

Following a full evidentiary hearing, reflected in the three volumes of transcript, and consideration of the party's post-hearing memorandum, I find the facts to be as follows:

On December 16, 2004 some 20 to 30 law enforcement personnel participating in the South Coast Anti-Crime Team ("Scat"), a multi-jurisdictional task force, gathered in Taunton, Massachusetts to execute multiple arrest warrants based on undercover narcotics transactions pursuant to an operation styled "Operation Crack Down." After staging that morning at the Taunton Police Station, the operation began at about noon with two squads of 6 to 8 officers each breaking out to track down the targets. Among the targets was 17-year-old Jesse Santos Texeira, who the police had reason to believe could be found at the Taunton High School in basketball practice.

Around 3:30 p.m., Detective Sergeant Michael Grundy of the Taunton Police Department, who was overseeing the operation, was driving through the City with Team members John O'Neill of the Bristol County Sheriff's Office, James Dykas of the Taunton Police Department and Gregory Ryan of the Swansea Police Department. The officers were armed and dressed in raid jackets with visible badges on chains. Although a different squad had been assigned the task of arresting Texeira--presumably at the

high school--Detective Grundy and the officers with him drove by Texeira's house. The officers had no intention of stopping there or otherwise finding out if anyone was home but when they observed two young black men walking down the driveway to Texeira's home, Grundy directed a U-turn to make further observations. They saw the men, at least one of whom, later identified as the defendant Benjamin, arguably matched identifying information the officers had regarding Texeira,[1] walk into Egan's Liquor Store.

    The officers parked their car outside Egan's and entered the small and cramped store where they saw the two men at the counter. Ryan was the first officer in, followed by Dykas, Grundy and then O'Neil. Grundy and Dykas asked the two men--the defendant Chad Benjamin and Edson Miranda, who were two or three feet away--for identification. Benjamin, who was dressed in a loose fitting sweatshirt, patted his clothing and then said his identification was in his car outside. Benjamin was told to put his hands up. Grundy then began patting Benjamin down; feeling a hard object which he identified as a weapon, Grundy yelled "Gun" and brought Benjamin to the ground and arrested him. He removed

---

[1] The initial match was at best, however, approximate and depended simply on general skin color. The 26-year-old defendant Benjamin was 5'11" tall, weighed 190 pounds and had a light-brown complexion. Texeira was 17-years-old, 6-feet tall, weighed 170 pounds and had a dark complexion. Nevertheless, the two men observed by the officers were wearing hooded sweatshirts so their specific features were obscured.

a .380 automatic pistol from Benjamin's pocket.  Benjamin did not resist or attempt to flee at any point during the confrontation.

-B-

For purposes of making clear the factual basis upon which I am allowing the defendant's motion to suppress, I also identify the central disputed factual assertion by the government which I expressly decline to make:

I find that until after he began patting the defendant down, Detective Grundy had no articulable basis to believe that Benjamin was carrying a concealed weapon.

-C-

Because my findings depend upon credibility determinations drawn from my observation of the witnesses during the hearing, I will also make certain comments upon the testimony.

First and most fundamentally, I have concluded, after the most careful review and consideration of the record, that contrary to his testimony Detective Grundy did not commence the pat down after observation of furtive motions or any other indicia suggesting Benjamin had a concealed weapon.  Rather I find that Detective Grundy acted upon a hunch--later validated--which upon recollective reconstruction he has transmuted into a series of uncorroborated purported suspicious observations.  In this connection, I have considered the unlikelihood that any observation of the weapon seized could be made through a loose

fitting sweatshirt of the type the defendant was wearing and have also concluded that Benjamin's own pat of his sweatshirt was consistent with an effort at locating identification.

Second, while in another setting I might undertake to resolve the inconsistencies in the testimony of the package store employees, I find the conflicting potential biases of these individuals--from the desire of Ms. Busczek somehow to embarrass her former employer for her subsequent termination on grounds of stealing to the desire of the remaining employee Mr. Higginbotham and the owner Don Walsh, whose business can be affected by the good or bad will of police officers, to deny having seen anything untoward at the time or in review of a later obliterated video tape of the confrontation--far too salient to justify reliance on any of their testimony.

Third, I credit the testimony of the officers, other than Detective Grundy, to the extent that none of them testified to seeing any sufficiently suspicious movements[2] by the defendant which could justify a pat down.  In this connection, I have considered the unlikelihood that any observations supporting particularized suspicion the defendant was armed and dangerous would have passed the notice of the other officers present or

---

[2] I do not find O'Neill's observation of the defendant's arms going "down towards his waist" suspicious or inconsistent with an effort to locate identification in response to police inquiry.

that the defendant would have undertaken potentially threatening movements in the presence of an overwhelming armed police presence during the confrontation.

## II. CONCLUSIONS OF LAW

The ground upon which I allow the motion to suppress is that Detective Grundy lacked sufficient justification in believing that Benjamin was armed and dangerous to the officers or others when he initiated the pat search. To be sure, the police were justified in approaching Benjamin and asking questions. And even if the encounter in the cramped package store may be characterized as a stop, I am prepared to conclude that there was sufficient particularized suspicion, albeit just barely, that Benjamin might have been Texeira, an individual subject to arrest; consequently the police were authorized under *Terry* v. *Ohio*, 392 U.S. 1 (1968), to detain Benjamin briefly to investigate the question of identification further.  *Adams* v. *Williams*, 407 U.S. 143, 146 (1972).  But the subsequent decision to pat Benjamin down did not have any justifiable basis.

In order to justify even a limited pat down search, a police officer "must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *Sibron* v. *New York*, 392 U.S. 40, 64 (1968).  As my findings of fact make clear, I have concluded that at the time the pat frisk took place, Detective Grundy had no such proper basis for an

inference of dangerousness.  Moreover, the mere potential for execution of an arrest warrant does not create "a case where the police had reason to suspect the presence of firearms based on the type of crime suspected." *United States* v. *Lott*, 870 F.2d 778, 785 (1st Cir. 1989).  I decline to "[e]xtend[] *Terry* [effectively to] adopt, as a practical matter, an automatic frisk rule" for any person who cannot immediately satisfy a police officer regarding his identity.  *United States* v. *McKoy*, 402 F.Supp.2d 311, 317 (D.Mass. 2004), *aff'd* 428 F.3d 38 (1st Cir. 2005).

For these reasons, I restate, after completed consideration, my grant of the defendant's motion to suppress the weapon seized in the unconstitutional search of his person during the pat down on December 16, 2004.  The docket shall reflect vacation of the original January 16, 2007 grant of the motion to suppress followed by its reinstatement on this date to assure the government the opportunity to exercise its right of review.  In accordance with the scheduling order entered February 1, 2007 the Government shall have 30 days from the entry of this Memorandum and Order on the docket to notice any appeal.[3]  Pending

---

[3] In response to the government's request for a status conference regarding the motion to suppress, I provided a bare endorsement of allowance of the motion subject to a memorandum to follow.  In order, however, to afford the government an opportunity to consider the memorandum ultimately issued, I informed the parties that I would renter the grant of the motion in a fashion that would permit the government the customary time

consideration of appeal, requests for modifications of detention may be addressed in the first instance to Magistrate Judge Dein for disposition in light of this Memorandum and Order.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

to consider appeal.